IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

PRINCE WILLIAM COUNTY ) 
SCHOOL BOARD, ) 
 ) 
    Plaintiff, ) 
 ) 
    v. )    Civil Action No. 1:24-cv-610 (RDA/LRV)
 ) 
DUSTIN LASSITER, *et al.*, ) 
 ) 
    Defendants. ) 

## MEMORANDUM OPINION AND ORDER

This matter comes before the Court on Plaintiff Prince William County School Board's ("PWCSB") Motions to Submit Additional Evidence (Dkt. 30) ("Evidence Motion"), Motion to Exclude Expert Testimony of Ronald T. Savage, Ed. D. (Dkt. 34) ("Expert Motion"), and Motion for Judgment on the Administrative Record (Dkt. 37) ("Judgment Motion"), as well as Defendants Dustin and Yesenia Lassiter's (the "Parents") Cross-Motion for Judgment on the Administrative Record (Dkt. 44) ("Cross Motion"), and Motions to Enforce Judgment (Dkts. 61, 67) (collectively, the "Enforcement Motions"). This matter has been fully briefed and is now ripe for disposition. This Court has dispensed with oral argument as it would not aid in the decisional process. *See* Fed. R. Civ. P. 78(b); Local Civil Rule 7(J). Considering the Motions together with the Administrative Record (Dkts. 25 and 25-1 through 25-11) (referred to as "A.R.") as well as the Memoranda in Support (Dkts. 31, 35, 38, 62, 68), Oppositions (Dkts. 45, 46, 47, 64), Replies (Dkts. 48, 49, 50, 51, 65), and Supplemental Briefing (Dkt. 69), this Court GRANTS-IN-PART and DENIES-IN-PART the Evidence Motion, GRANTS the Expert Motion, DENIES the Judgment

Motion, GRANTS the Cross Motion, and GRANTS-IN-PART and DENIES-IN-PART the Enforcement Motions for the reasons that follow.[1]

## I.    FACTUAL BACKGROUND

The following facts are derived from the administrative record and the uncontroverted allegations in the parties' pleadings.

Student I.L. ("Student") transferred to Prince William County Schools ("PWCS") in the 2018-2019 school year.  A.R. 916.  Student has a venous malformation in her right hand and has been diagnosed with Attention Deficit Disorder ("ADD").  *Id.*  Due to these conditions, when she began her studies with PWCS, she qualified for assistance pursuant to Section 504 of the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 794 ("Section 504").  *Id.*; *see also* A.R. 81.

For seventh and eighth grades, Student attended Gainesville Middle School.  A.R. 81.  During the 2021-2022 school year, Student had an Individual Accommodation, Section 504 Plan.  *Id.* (the "2022 Plan").  The 2022 Plan permitted Student to limit high-impact activities at her discretion and, after an amendment, included intermittent home-based services in the amount of 3 hours for every 3 consecutive absences.  *Id.*

On March 17, 2022, Student was found eligible for special education services under the category of "other health impairment" based on the ADD and venous malformation diagnoses as well as deficits in working auditory memory.  *Id.*  The Student also has a diagnosis of anxiety and vision impairments of amblyopia[2] and myopia[3].  *Id.*  These conditions meant that Student: (i)

---

[1] As the Court was making the determinations in this Memorandum Opinion and Order, the Parents filed a second Motion for a Temporary Restraining Order.  Dkt. 72.  That Motion will be discussed *infra* with the Enforcement Motions.

[2] Amblyopia is commonly referred to as a lazy eye.

[3] Myopia is also known as nearsightedness.

2

experiences pain when performing fine motor tasks, including writing; (ii) is absent from school due to her medical conditions; (iii) experiences difficulties focusing on coursework and instruction; and (iv) requires specially designed instruction. A.R. 1158.

The Hearing Officer found that, during this time period, Student underwent surgical procedures for her hand and missed between 42 and 46 days of school, requiring both homebound and homebased instruction. A.R. 81. Additionally, at some point, Student was required to take blood thinners, and, when she asked to stop running or fast walking during a gym class because she tasted blood, her request was denied and thereafter Student had to go to the hospital. A.R. 82.

In March 2022, Dr. John Dresely, a neuro-optometrist, recommended vision therapy for Student due to the amblyopia in her right eye. A.R. 1144. Included with his diagnosis, Dr. Dresely wrote a note, specifically tailored to Student, titled "What the Classroom Teachers Can Do To Help." A.R. 1146. It included certain recommendations, including: (i) visual breaks every 8-10 minutes; (ii) use of her finger or a ruler to help her keep her place when reading; (iii) use of larger print with a lot of white space when making handouts and worksheets; (iv) giving her additional time on tests or other timed activities; and (v) if additional time is not given, having someone read the test material to her and allowing her to give answers verbally. *Id.*

In April 2022, PWCS began working to implement an Individualized Education Plan ("IEP") for Student. A.R. 1229-33. After the Parents were unavailable to meet with the IEP team in April, PWCS scheduled two IEP meetings in May 2022 wherein the Parents participated. A.R. 3557 at 906:1-10. On May 26, 2022, PWCS revised the proposed IEP, and the Parents consented to it on June 16, 2022. A.R. 940-962 (the "Initial IEP"). The Initial IEP set forth several accommodations to be provided to Student, including: (1) a flexible schedule to include breaks during class; (2) access to a stress/fidget item to exercise her hand; (3) weekly check ins with a

3

case manager; (4) extended time for assignments; (5) a fast pass to the nurse to be excused from class; (6) a non-verbal communication card to signal to instructors when she experienced hand pain and required a break; (7) printed copies of notes; (8) reductions in assignments based on mastery of content or skills; (9) check-ins with teachers during class; and (10) teachers re-explaining or re-iterating important instructional parameters. A.R. 952-53. The Initial IEP also provided for additional special education services. A.R. 953, 957-59. And the Initial IEP provided that Student's needs could be accommodated in the least-restrictive environment of her public-school setting. A.R. 959.

In August 2022, the IEP team reconvened. A.R. 1512. A revised IEP was provided to the Parents on August 24, 2022; however, the Parents refused to grant consent to implement the revised IEP. A.R. 1536-37. In particular, Student's mother stated, "I am confused on what I am consenting or not consenting to," and indicated that she did "not fully agree to the goals the school and teachers came up with." *Id.* Additional meetings were then held in September and November 2022 to review Student's IEP and to ensure those concerns were addressed. A.R. 1677, 3327 at 469:3-13.

On October 1, 2022, Dr. Lindsay Russow, a pediatrician, wrote a letter to PWCS suggesting that an emergency action plan for Student be put in place as part of Student's IEP. A.R. 1601-02.

In November 2022, Student reached out to her case manager, Adelina Blankenship, conveying symptoms of anxiety, bullying, and feeling generally overwhelmed. A.R. 1649. Ms. Blankenship responded two days later sharing her concerns with another staff member, but not otherwise proposing a specific plan to assist Student. *Id.*

Also in November 2022, PWCS again provided a draft IEP to the Parents, and the Parents refused their consent. A.R. 1677-705. According to records with the proposed IEP, the Parents

4

disagreed with proposals for compensatory time after school, because they would conflict with Student's therapy for her hand, and instead asked that compensatory time be provided during the evenings or weekends or during the school day. A.R. 1703. The Parents also believed that the proposed IEP did not appropriately address Student's anxiety and rejected a proposed service to provide counseling during the school day, as this would take Student out of class and, they believed, cause more anxiety. A.R. 1704. The Parents also rejected math supports in the special education setting because they felt it would be too restrictive and would impact her mental health. *Id.* At the end of November 2022, Student was approved for homebound instruction through January 23, 2023. A.R. 82. Another IEP meeting occurred in December 2022, and PWCS continued to revise the IEP to address the Parents' concerns. A.R. 909. The Parents consented to the revised IEP (the "Second IEP") on January 11, 2023. A.R. 937.

The Second IEP maintained the full extent of accommodations from the Initial IEP and also extended her "fast pass" to include using the restroom anytime upon request and provided for more individualized instruction. A.R. 930-31, 935. The Second IEP also reflected Student's approval for homebound instructional services to further address her needs. A.R. 936. Homebound instruction was an accommodation that the Parents had sought. *See* A.R. 1308 (Student's mother informing PWCS in an email that "[Student] was also not considered for any type of homebound services which I have repeatedly asked for").

In February 2023, Dr. Russow wrote a second letter requesting that intermittent home-based services be written into Student's IEP. A.R. 1916-19. On February 2, 2023, Student was approved for homebound services until April 11, 2023. A.R. 82.

In March 2023, the IEP team met again to prepare a new IEP and to address concerns raised by the Parents regarding homebound services and compensatory education. A.R. 2031; A.R. 2032

(discussing Parents' concerns regarding teacher shortages, impact of Student's medications, teachers encouraging Student to "catch up" and causing an increase in anxiety, the lack of a plan to assist Student in catching up on work missed, and Student's mental health). A revised draft IEP was circulated in May 2023, and Parents refused to consent. A.R. 2031-61; A.R. 2071 (an email from Student's mother indicating that the revised IEP did not include "the additional information I wanted in the IEP").

In seventh grade, Student opted out of the seventh grade Standards of Learning ("SOLs"). A.R. 82. In eighth grade, Student failed her math and civics SOLs but passed her reading and science SOLs. *Id.* She was scheduled to take the writing SOL but failed to arrive on time. *Id.* During the summer after Student's eighth-grade year, the Parents stated that they did not believe PWCS was providing Student with a Free Appropriate Public Education ("FAPE") and indicated that they desired to have Student placed in a private school setting. A.R. 3581-82, Tr. at 1004:8-1005:7. Specifically, on July 26, 2023, an attorney representing Student wrote a letter to PWCS requesting that the IEP team consider other placement options and PWCS denied the request. A.R. 82. The IEP team determined that private placement would not be the least restrictive environment because it would "remove her out of her community, her base school, when those services and supports can be provided by the division." A.R. 3586-87, Tr. at 1024:7-20.

On August 8, 2023, Parents notified PWCS of their intention to enroll Student at a private school. A.R. 83. On August 14, 2023, Student applied to attend The Wakefield School without having informed PWCS of the application. *Id.* The Wakefield School is a private college preparatory school, not certified by the Virginia Department of Education ("VDOE") to provide special education services. A.R. 62; A.R. 3465-73 at Tr. 734:6-768:2; *see also* Virginia Department of Education, *Private Day & Residential Schools*, *available at*

https://www.doe.virginia.gov/programs-services/special-education/private-day-residential-schools (listing schools authorized to operate for students with disabilities and not including The Wakefield School). Ashley Harper, the Head of School at The Wakefield School, testified that The Wakefield School does not have special education services and does not follow IEPs, but does have learning support systems. A.R. 62. In connection with her application to The Wakefield School, Student passed an academic admissions test and Student performed "well enough to be admitted." A.R. 63. On August 21, 2023, the Parents paid the deposit at The Wakefield School and Student began attending the school in September 2023. A.R. 83.

PWCS continued to offer additional accommodations to address the Parents's concerns. A.R. 2838. Despite confirming that they would attend an October 5, 2023 IEP meeting, the Parents cancelled right before the meeting. A.R. 3543 at 852:10-16. PWCS then formulated another draft IEP for Student, which provided for academic support by a licensed special education instructor and collaborative classes. A.R. 2838-70. PWCS also proposed IEP meetings that would be facilitated through a third-party to address Parents' feelings of unease with respect to PWCS staff. A.R. 3621 at 1162:10-14.

On October 23, 2023, Parents filed a due process request for a hearing (the "Administrative Complaint"). A.R. 48. The Administrative Complaint was assigned to Hearing Officer Rhona J.S. Mitchell (the "Hearing Officer") for adjudication. A.R. 15, 48. After the Hearing Officer found that the original Administrative Complaint was insufficient to grant a due process hearing, she allowed Parents to file an amended Administrative Complaint. A.R. 19-21, 48-49. On November 3, 2023, Parents filed the Amended Administrative Complaint. A.R. 49.

The parties had a number of pre-hearing disputes that required decisions by the Hearing Officer. A.R. 49. The hearing was initially scheduled for December 5 and 6, 2023. A.R. 49.

Although the hearing commenced on December 5, 2023, the parties jointly moved that the hearing be temporarily stayed so that they could negotiate before proceeding. A.R. 50. The Hearing Officer granted the motion and, that same day, the parties reached a settlement on the issues of vision therapy, compensatory education owed to Student, and reimbursement for an independent educational evaluation. A.R. 50. The oral agreement was put on the record and culminated in a written agreement dated January 3, 2024. *Id.*

After resolving those issues, the Hearing Officer identified the following three issues as the basis for the hearing: (i) Whether PWCS failed to develop, implement, and/or revise the Student's 504 Plan and/or IEP in a manner reasonably calculated to enable Student to make progress and provide Student with a FAPE for her 7th and 8th grade years; (ii) Whether Student should be educated in a private school setting in order to receive a FAPE; and (iii) Whether PWCS should reimburse the Parents for tuition associated with placing Student in The Wakefield School. A.R. 52. The Hearing then proceeded on January 9, 10, and 11, 2024. A.R. 3235-3747. At the hearing, the Parents were represented by Dr. Kimberly Mehlman-Orozco, a non-attorney advocate. A.R. 51. PWCS was represented by Nicole M. Thompson, an attorney employed by PWCS. *Id.*

During the Hearing, Parents called twelve witnesses and offered testimony from the Student and her mother. A.R. 51-52. Among the witnesses called was Student's PWCS Principal, Mary Kathryn Graham, who testified that the Parents had refused several accommodations offered for Student, including counseling, a learning strategies class, and smaller class sizes. A.R. 3303, at 371:16-372:12. Dr. Wendy Martin-Johnson, the PWCS Director of Programs and Development, testified that she believed that PWCS had provided Student with a FAPE and that a concerted effort had been made to address the Parents' concerns. A.R. 3619 at 1154:18-1155:6. Dr. Martin-Johnson also opined that placement in a private preparatory school was inappropriate where PWCS

8

was and remains able to provide a FAPE. A.R. 3617 at 1145:5-1146:8. Ms. Harper, the Head of The Wakefield School, testified that The Wakefield School does not "have a separate special education process or offer anything like that" and that it is not obligated to follow an IEP. A.R. 3465 at 734:6-17. She further testified that there are "certain aspects of public school IEPs that we wouldn't follow" and that "there are times, for example, that [The Wakefield School] may not have the specialist necessary to see through something in an IEP from a public school." A.R. 3465 at 735:14-736:6. In explaining the services offered by The Wakefield School, Ms. Harper testified that it has an "Academic Resource Center" or "ARC" where students can get additional support. A.R. 3466 at 740:15-19. The ARC is not specific to special education and is available only for an additional cost: $3,500 for "baseline services" or $7,500 for more "individualized services" on top of the $32,300 in tuition. *Id.*; *see also* A.R. 3473 at 767:17-768:8.

The Hearing Officer issued her decision (the "Decision") on February 29, 2024. A.R. 48-93. The Hearing Officer first decided that PWCS had not properly implemented Student's 504 Plan, relying on the incident where Student asked her gym teacher to stop running and the teacher denied the request. A.R. 83. The Hearing Officer found that this violated the 504 Plan's requirement that Student should limit high-impact activities at her discretion. A.R. at 84. The Hearing Officer also found that the 504 Plan was violated because Student did not receive the amount of home-based instruction to which she was entitled, because there were six hours of home-based services due to Student. *Id.* The Hearing Officer also determined that PWCS had not provided Student with a FAPE, relying on: (i) her finding that PWCS failed to provide timely homebound instruction to Student; (ii) her finding that PWCS failed to initially consider compensatory educational services that may be owed to Student due to the delay in homebound instruction; and (iii) her finding that PWCS failed to follow the recommendations of Dr. Dresely.

9

A.R. 85-88.  Having determined that PWCS had failed to provide a FAPE, the Hearing Officer next considered whether PWCS could, at that time, provide Student with a FAPE.  A.R. 88.  The Hearing Officer determined that whether PWCS could provide a FAPE going forward was "contingent on too many variables," including the "toxic relationship" between the parties.  A.R. 88-89.  Despite this finding, the Hearing Officer recognized that "[t]he [P]arents were not completely without fault." A.R. 89.

The Hearing Officer next turned to whether Student should be educated in a private school setting.  The Hearing Officer determined that The Wakefield School can provide Student with a FAPE because it "offers no quibbling about compensatory services, whether homebound services are needed, how many hours are owed, or the content of IEPs." A.R. 90.  The Hearing Officer also found that, "despite the fact that The Wakefield School does not provide special education services *per se*, it is equipped to handle the unique needs of the student, including but not limited to, her inherent absences and tardies due to illness associated with her disabilities." A.R. 92.  The Hearing Officer recognized that the Parents did not comply with the IDEA requirement to provide PWCS with notice of their intent to place Student in private school.  *Id.*  To address this defect, the Hearing Officer held that "reimbursement to the parents for tuition costs at The Wakefield School should be proportionally reduced by two days." *Id.*  The Hearing Officer also held that "[t]here will be no reimbursement for any activity costs or other fees associated with the student's education at The Wakefield School." *Id.*

## II.    PROCEDURAL BACKGROUND

On April 12, 2024, PWCS filed the Complaint in this action.  Dkt. 1.  The Complaint does not seek reimbursement for The Wakefield School tuition paid for Student's 9th grade year but challenges the Hearing Officer's authority to make a prospective order awarding tuition for future

10

years. *Id.* On May 28, 2024, the Parents filed an Answer. Dkt. 12. On May 31, 2024, a Scheduling Order issued. Dkt. 13. On July 12, 2024, PWCS filed the Administrative Record. Dkt. 25. On October 4, 2025, PWCS filed: (i) the Evidence Motion; (ii) the Expert Motion; and (iii) the Judgment Motion. Dkts. 30, 34, 37. On October 9, 2024, the Parents filed a Motion to Strike the Evidence Motion and the Expert Motion. Dkt. 39. On October 11, 2024, PWCS filed its Opposition to the Motion to Strike. Dkt. 42. That same day, U.S. Magistrate Judge Lindsey R. Vaala denied the Motion to Strike. Dkt. 43.

On October 18, 2024, the Parents filed their Opposition to the Judgment Motion and Cross-Motion. Dkts. 44-46. The Parents also filed their Opposition to the Evidence Motion. Dkt. 47. On October 24, 2024, PWCS filed its Replies. Dkts. 48, 59, 50. On October 30, 2024, the Parents filed their Reply in support of their Cross Motion. Dkt. 51.

On February 6, 2025, the Parents filed a Motion for a Temporary Restraining Order ("TRO Motion") seeking payment of Student's tuition at The Wakefield School. Dkt. 52. On February 7, 2025, the Court issued an Order setting a hearing on the TRO Motion and directing PWCS to respond. Dkt. 54. On February 11, 2025, PWCS filed its Opposition. Dkt. 55. On February 12, 2025, the Parents filed their Reply. Dkt. 56. On February 13, 2025, the Court held a hearing. Dkt. 57. That same day, an Order issued granting in part and denying in part the TRO Motion. Dkt. 58. In that Order, the Court found: (i) that The Wakefield School was an appropriate stay-put institution for Student; (ii) that the Parents were only entitled to reimbursement; and (iii) that PWCS was entitled to the provision of certain receipts and progress reports. *Id.* The Court set forth specific directions for the parties to follow regarding reimbursement of *tuition* expenses. *Id.*

On August 11, 2025, the Parents filed a Motion to Enforce the Judgment. Dkt. 61. The Parents sought reimbursement for the ARC fee and for tuition insurance. *Id.* The Parents also

sought to hold PWCS in contempt of court. *Id.* On August 15, 2025, PWCS filed its Opposition. Dkt. 64. On August 19, 2025, the Parents filed a Declaration. Dkt. 65.

On September 24, 2025, the Court issued an Order regarding the pending Motions and the fact that the Court had been required to address an influx of emergency motions that required decision on an urgent basis. Dkt. 66. The Court therefore offered the parties an opportunity to supplement their filings to make the Court aware of any new case law or issues that had arisen in the interim. *Id.*

On October 15, 2025, the Parents filed a Second Motion to Enforce Judgment. Dkt. 67. This time, Parents framed the amount sought as "outstanding tuition obligations." *Id.* That same day, PWCS filed its Supplemental Brief. Dkt. 69. On October 16, 2025, the Parents waived hearing on the Second Motion. Dkt. 70. On October 29, 2025, PWCS filed its Opposition. Dkt. 71.

### III.    Evidence Motion

Before reaching the merits of this appeal from the Hearing Officer's Decision, it is necessary to consider PWCS's Evidence Motion which seeks to supplement the record with additional evidence. Dkt. 30. Specifically, PWCS seeks to introduce: (i) the deposition testimony of Heather Riddle; and (ii) the expert reports and deposition testimony of Donice Davenport, Ed. D. Dkt. 31 at 1. In this regard, PWCS asserts that its efforts with respect to Student did not end following the Hearing Officer's Decision; rather, PWCS met in September 2024 and created an IEP for her 10th grade year calling for a public-school placement. *Id.* at 3. PWCS asserts that Ms. Riddle was part of the September 2024 IEP team and that Ms. Riddle had not been involved in previous IEP discussions regarding Student in order to provide fresh perspective. *Id.* at 4. PWCS also offers the opinions of Dr. Davenport that: (i) a student with a disability necessitating

12

private placement should not be placed at a non-licensed college preparatory school; and (ii) PWCS can provide Student a FAPE in the public-school setting. *Id.*

The IDEA provides that district courts "shall hear additional evidence at a party's request" when reviewing a hearing officer's decision. 20 U.S.C. § 1415(i)(2)(C). The Fourth Circuit has recognized, however, that there are limits to this requirement; specifically, the Fourth Circuit has held that district courts have the authority to tailor IDEA proceedings. *See Springer v. Fairfax Cnty. Sch. Bd.*, 134 F.3d 659, 666-67 (4th Cir. 1998); *Schaffer ex rel. Schaffer v. Weast*, 554 F.3d 470, 477 (4th Cir. 2009). In *Springer*, the Fourth Circuit held that such authority was necessary to protect the role of due process hearings as the primary forum in which to resolve disputes. *Id.* at 667. The Fourth Circuit has also cautioned district courts to be wary of evidence that arises only after a due process hearing, because it undercuts the review process. *Schaffer*, 554 F.3d at 477. The Fourth Circuit, in *Springer*, adopted the First Circuit's approach in *Town of Burlington v. Dep't of Education*, 736 F.2d 773 (1st Cir. 1984). In *Burlington*, the First Circuit held that additional evidence might include "evidence concerning relevant events occurring subsequent to the administrative hearing." 736 F.2d at 790.

An analysis of the proposed evidence here, counsels that PWCS's Motion should be granted in part and denied in part. The Motion will be granted with respect to Ms. Riddle's testimony regarding the IEP. This evidence was clearly not available at the time of the Hearing, and it is the same kind of evidence that the Fourth Circuit recognized the district court's authority to admit in *Schaffer*. 554 F.3d at 475-76 (holding that the district court did not abuse its discretion by admitting additional evidence and "treating such evidence cautiously"). Following *Schaffer*, district judges in this District have also admitted similar post-hearing IEPs. *See M.S. v. Fairfax Cnty. Sch. Bd.*, 2006 WL 2376202, at *5 (E.D. Va. Aug. 11, 2006) ("In this regard, evidence of

13

post-hearing IEPs and M.S.'s progress subsequent to the hearing is decidedly relevant and is properly appended to the administrative record."). Accordingly, the Court will consider Ms. Riddle's deposition testimony regarding the 2024 IEP process and the IEP that the team developed. Dkt. 32.

With respect to Dr. Davenport, PWCS suggests that Dr. Davenport will opine on the following issues: (i) whether anyone should make a private placement at a school like The Wakefield School; and (ii) whether the 2024 IEP would provide a FAPE. To begin with, PWCS has not demonstrated that Dr. Davenport's opinion with respect to placement at The Wakefield School was not available at the time that the Hearing took place. PWCS knew that Student had been enrolled at The Wakefield School and that the Parents were seeking reimbursement and a determination that The Wakefield School could provide a FAPE and was the least restrictive environment. It is unclear to the Court why PWCS would not have been on notice to present evidence from Dr. Davenport in this regard. As the Fourth Circuit has cautioned, exclusion of "testimony from all who did, or could have, testified before the due process hearing would be an appropriate limit in many cases." *Springer*, 134 F.3d at 667. With respect to Dr. Davenport's opinion regarding whether PWCS can provide a FAPE that is an issue for the Court to determine, and it is unclear to the Court of what assistance such opinions are likely to be or why the Court would need such assistance. Again, this appears to be the kind of overstep against which the Fourth Circuit has warned reviewing courts in IDEA cases, and district courts have generally declined to exercise their discretion to admit such additional expert evidence. *See, e.g.*, *Sauers v. Winston-Salem/Forsyth Cnty. Bd. of Educ.*, 2016 WL 10587945, at *2 (M.D.N.C. Dec. 19, 2016) (following *Springer* Court's admonition and holding that motion for additional expert evidence would reduce "the proceedings before the state agency to a mere dress rehearsal"). Accordingly,

14

the Motion will be denied with respect to Dr. Davenport and the proposed evidence in docket entries 32-1, 32-2, and 32-3 will not be considered.

IV.    Expert Motion

PWCS also seeks to exclude certain expert testimony from the Parents' expert, Ronald T. Savage, Ed.D. Dkt. 34. PWCS argues that Dr. Savage's Report discloses no data, methodology or analysis. Dkt. 35 at 1.

On August 26, 2024, the Parents disclosed Dr. Savage as an expert in the field of special education. *Id.* at 2. Dr. Savage's Report, apparently drafted in 2024 after the commencement of this case, discloses two opinions: (i) PWCS failed to develop, implement, and/or revise Student's 504 Plan and IEP for the 2021-22 and 2022-23 school years in a manner reasonably calculated to enable the student to receive educational benefits; and (ii) The Wakefield School is an appropriate private placement. Dkt. 36.

As an initial matter, it appears that Dr. Savage's Report was created after the Hearing Officer's Decision in this matter. Dkt. 36 at 8 (referring to the Hearing Officer's Decision as part of the material he reviewed). Moreover, Parents – unlike PWCS – did not file a motion to admit additional evidence. Thus, Dr. Savage's Report is not part of the Administrative Record to be considered by this Court, and there is no motion seeking to make it part of the record to be considered by this Court. Accordingly, the Expert Motion is granted, and Dr. Savage's Report is excluded, because it was never part of the Administrative Record in the first place. Even assuming that Parents had properly moved to make Dr. Savage's Report part of the Administrative Record, it would be excluded under *Springer* for the same reasons that Dr. Davenport's opinions were

15

excluded.[4]  The parties do not address the fact that Dr. Savage's Report apparently arose after the Hearing Officer's Decision and that no party has moved to include the Report as part of the Administrative Record.  The Court will therefore also analyze the arguments raised by PWCS under Rule 702 of the Federal Rules of Civil Procedure.

Federal Rule of Evidence 702 permits a witness who is qualified as an expert by knowledge, skill, experience, training, or education to testify if the proponent demonstrates to the court that it is more likely than not that:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702.  Rule 702 "imposes a special obligation upon a trial judge to 'ensure that [expert] testimony . . . is not only relevant, but reliable.'" *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999) (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993)).  Rule 702 requires that expert testimony "assist the trier of fact to understand the evidence or to determine a fact in issue," which "goes primarily to relevance." *Daubert*, 509 U.S. at 591.  Rule 702 also requires "a reliable basis in the knowledge and experience of [the relevant] discipline." *Kumho Tire*, 526 U.S. at 149 (quoting *Daubert*, 509 U.S. at 592).  In determining reliability, courts consider whether a "theory or technique . . . can be (and has been) tested, whether it has been subjected to peer review and publication . . . and whether it has attracted widespread acceptance within a relevant scientific community.  The inquiry is a flexible one, and its focus must be solely on principles and methodology, not on the conclusions that they

---

[4] Indeed, Dr. Davenport and Dr. Savage address the same principles and come to different conclusions.  It is unclear why the Court needs the assistance of an expert to determine whether PWCS provided a FAPE or whether The Wakefield School is an appropriate placement.

generate." *Daubert*, 509 U.S. at 580.   The *Daubert* factors "do not constitute a definitive checklist," as a court's "gatekeeping inquiry must be tied to the facts of a particular case." *Kumho Tire*, 526 U.S. at 150 (cleaned up) (explaining that "the relevant reliability concerns may focus upon personal knowledge or experience").

As judges in this District and the Fourth Circuit have recognized, "an expert report should be a comprehensive document that, by itself, provides all the expert's opinions that will be offered at trial, along with the bases for those opinions." *Samsung Electronics Co., Ltd. v. Nvidia Corp.*, 314 F.R.D. 190, 198 (E.D. Va. 2016) (citing *Campbell v. United States*, 470 F. App'x 153 (4th Cir. 2012)).  Here, Dr. Savage's Report does not comply with the strictures of Rule 26 and is not capable of standing alone as a comprehensive document.  The Report itself is a mere five pages and comprises simply conclusory opinions regarding Dr. Savage's view that PWCS failed to comply with the 504 Plan and IEP and his view that The Wakefield School is an appropriate placement for Student because she likes it better there.  Dkt. 36.  It is not clear that reaching these opinions required the application of any particular expertise or, if it did, how such expertise applied.  Accordingly, the Report would also be properly excluded on the basis that it fails to comply with Rule 702 and Rule 26.  *See, e.g.*, *Wood v. Credit One Bank*, 277 F. Supp. 3d 821, 858 (E.D. Va. 2017) (excluding opinion where expert "sets forth no methodology for reaching his conclusions, and his opinions therefore lack reliability").

The Parents appear to concede that the Report cannot stand on its own and therefore focus on Dr. Savage's deposition testimony.  Dkt. 46 at 2 (relying on deposition testimony).  But Dr. Savage's deposition and supplemental declaration, filed after the deadline for disclosure of expert opinions, cannot avoid the deficiencies in the Report.  *See Davis v. Capital One, N.A.*, 2023 WL 6964051, at *11 (excluding supplemental expert declaration as untimely and unreliable).  Although

Dr. Savage's declaration purports to connect his opinions to a "clinical methodology," Dr. Savage never explains what that methodology involved. Dkt. 46-1. Moreover, Dr. Savage's opinion regarding the appropriateness of placement at The Wakefield School appears based almost entirely on Dr. Savage's review of the Hearing Officer's Decision and an hour reviewing The Wakefield School's website. *Id.* at ¶¶ 12-13; Dkt. 36-1 at 52:16-20. These deficiencies make it difficult for the Court to find Dr. Savage's opinions necessary or reliable. Accordingly, the Court must perform its gatekeeping function and grant the Expert Motion.

In sum, the "Expert Motion" is granted because: (i) the Parents never moved to supplement the Administrative Record with Dr. Savage's Report; (ii) as Parents appear to concede, the Report cannot stand on its own; and, (iii) even considering the declaration and Dr. Savage's deposition, there does not appear to be a methodology or application of expertise here that would render his opinions reliable.

## V.     Cross-Motions for Judgment on the Administrative Record

It is well-settled and undisputed by the parties that a district court reviewing a state administrative decision under the IDEA may grant a motion for judgment on the administrative record. *See Cnty. Sch. Bd. of Henrico Cnty., Va. v. Z.P. ex rel. R.P.*, 399 F.3d 298, 309 n.7 (4th Cir. 2005). And, in reviewing the administrative decision, a district court engages in a modified *de novo* review, making an "independent decision based on the preponderance of the evidence," while at the same time giving due weight to the administrative findings. *Doyle v. Arlington Cnty. Sch. Bd.*, 953 F.2d 100, 103 (4th Cir. 1991). Because a district court does not have the same opportunity to hear and observe the demeanor of witnesses as they testify, and thus to assess the weight and credibility of evidence presented at the hearing, the hearing officer's administrative findings of fact are considered *prima facie* correct, and the district court must explain its reasoning if it

chooses not to follow those findings. *A.B. ex rel. D.B. v. Lawson*, 354 F.3d 315, 325-28 (4th Cir. 2004); *see also J.P. ex rel. Peterson v. Cnty. Sch. Bd. of Hanover Cnty., Va.*, 516 F.3d 254, 259-60 (4th Cir. 2008). This deference is limited to the hearing officer's factual findings, and thus a district court must make an independent, *de novo* determination of the IDEA's legal requirements. *See Doyle*, 953 F.2d at 105 (noting that the "due weight" requirement requires deference to the state administrative authorities' factual findings); *cf. A.W. ex rel. Wilson v. Fairfax County Sch. Bd.*, 372 F.3d 674, 677 (4th Cir. 2004) (reviewing *de novo* "the district court's interpretation of the IDEA"). Finally, it is well-established that the party challenging the administrative decision bears the burden of establishing that the administrative decision was erroneous. *Schaffer v. Weast*, 546 U.S. 49 (2005); *A.K ex rel J.K. v. Alexandria City Sch. Bd.*, 484 F.3d 672 (4th Cir. 2007). These general principles provide the lens through which a court reviews the administrative IDEA record.

### A.    Variance Between Complaint and Judgment Motion

As an initial matter, the Court notes that, as with any civil case, the contours of the case are dictated by the complaint filed. Here, PWCS filed a Complaint which challenged: (i) the finding that The Wakefield School could provide a FAPE; (ii) the Hearing Officer's alleged failure to conduct the hearing in conformity with the requirements of *Sch. Comm. of Town of Burlington, Mass. v. Dep't of Educ. of Mass.*, 471 U.S. 359, 369-70 (1985); (iii) the finding for the Parents despite the Parents' alleged failure to meet their burden of proof; (iv) the Hearing Officer's alleged failure to give deference to PWCS's witnesses; and (v) the Hearing Officer's findings as irregular and contrary to the law and evidence. Dkt. 1 at 23-26. In seeking relief, PWCS sought: (i) vacatur of the Hearing Officer's Decision; (ii) a finding that PWCS provided a FAPE to Student during her 7th and 8th grade school years; (iii) a finding that PWCS's public schools are an appropriate

19

placement for Student and that the 2023-24 IEP provides a FAPE; and (iv) a finding that The Wakefield School did not and cannot provide a FAPE to Student. *Id.*[5]

PWCS's Judgment Motion is disconnected from the counts raised in its Complaint. The relief sought in the Judgment Motion is not tethered to any count of the Complaint. Indeed, PWCS's brief in support of its Judgment Motion does not mention any count of the Complaint. As courts often instruct litigants, parties must "ensure that their requests for relief are tied to the counts in their complaints." *Preston v. Bd. of Trs. Of Chicago State Univ.*, 2015 WL 327369, at *9 (N.D. Ill. Jan. 26, 2015); *Hare v. Custable*, 2009 WL 3647045, at *6 (N.D. Ill. Aug. 31, 2009) (noting that a court is constrained on summary judgment to consider only the claims alleged in the complaint). Here, PWCS has failed to directly connect any of the counts raised in its Complaint to the Judgment Motion. As the Parents correctly note, all of the relief that PWCS seeks in its Complaint is backward looking, while the relief sought in the Judgment Motion is forward looking. *Steves & Sons, Inc. v. JELD-WEN, Inc.*, 988 F.3d 690, 728 (4th Cir. 2021) (recognizing "[j]udgment as a matter of law may be granted only 'on a claim or defense'"). Accordingly, the Court is left without a framework within which to assess PWCS's Motion. Thus, to the extent that PWCS's Motion rests on its prospective placement argument, the Judgment Motion is denied, because it is untethered to any claim in the Complaint, which is focused on the 2023-24 school year and backward looking. In the same vein, the Cross-Motion is granted in this regard.

---

[5] In briefing filed in this matter, PWCS has abandoned its claims looking back to the 2023-24 school year. Dkt. 31 at 2 ("In this case, PWCS does not seek reimbursement for The Wakefield School tuition paid for the Student's 9th grade year."); Dkt. 38 at 2 n.1 ("PWCS is not challenging the H.O.'s order of reimbursement for Student's 9th grade year at The Wakefield School.").

## B. Prospective Placement

The Court nonetheless addresses PWCS's prospective placement argument and finds it unavailing. Specifically, PWCS argues that, although "due process hearing officers are authorized to order reimbursement for private placements made by parents, they are not authorized to themselves order prospective private placement." Dkt. 38 at 22. PWCS thus appears to challenge the Hearing Officer's determination that: "The student will continue her education at The Wakefield School, at public expense." A.R. 92. PWCS reads this order as requiring "multiyear private placement for three years, not subject to annual review." Dkt. 38 at 24.

At the time that the Hearing Officer issued her Decision, Student had been attending The Wakefield School for a little longer than one semester and was in the midst of the academic year. A.R. 67 (Student enrolled at The Wakefield School in September 2023); A.R. 97 (Decision issued on February 29, 2024). Thus, in context, it makes sense that the Hearing Officer would order that Student continue her education at The Wakefield School for the remainder of the year. But the Hearing Officer's Decision does not expressly state, as PWCS contends, that this placement was "for the next four years" or that the placement was to be made "without providing for any ability to review this newly ordered IEP, or such placement." Dkt. 38 at 25. Indeed, the Hearing Officer's instructions in this regard appear to follow the Supreme Court's directives in *Burlington*. 471 U.S. at 370 ("In a case where a court determines that a private placement desired by the parents was proper under the Act . . . , it seems beyond cavil that 'appropriate' relief would include a prospective injunction directing the school officials to develop and implement at public expense an IEP placing the child in a private school.").

In deciding the limited issues before her, the Hearing Officer determined that PWCS had not provided a FAPE and that The Wakefield School could provide a FAPE and directed that

21

PWCS convene the IEP team to place Student at The Wakefield School. By making Student's placement at The Wakefield School part of the IEP, the Hearing Officer made that placement subject to the annual review process for IEPs. 34 C.F.R. § 300.116(b)(2) (directing that a "child's placement . . . [be] determined at least annually"); 20 U.S.C. § 1414(d)(4)(A)(i) (requiring that IEPs be review "periodically, but not less frequently than annually"). Nothing in the Hearing Officer's Decision reflects an intent to violate these statutory and regulatory requirements. Rather, PWCS reads much into the Hearing Officer's commentary, in determining that PWCS failed to provide a FAPE, that the relationship between Parents and the school was "beyond repair" and her speculation that in "the 11th and 12th grades" the parties "will return to due process" due to their broken relationship. A.R. 89. But the ordering paragraphs of the Decision do not purport to remove the normal statutory requirements of annual review of the IEP process and, indeed, the Decision specifically makes Student's placement at The Wakefield School part of that IEP process.

Thus, the Hearing Officer's Decision does not require a multiyear placement of Student at The Wakefield School without review on an annual basis as part of the IEP process. Rather, the Hearing Officer's Decision made Student's placement squarely part of the IEP annual review process, by directing PWCS to convene an IEP team meeting to place Student at The Wakefield School. A.R. 93. Before the beginning of each school year, PWCS is permitted by statute to develop a new IEP that recommends placement of Student within PWCS schools or, as appropriate, in a private school. 20 U.S.C. § 1414(a)(5) (requiring that IEP be developed or revised for each child at the beginning of each school year). Accordingly, because the Hearing Officer

did not order a multiyear placement as asserted by PWCS, the Judgment Motion will be denied in this regard and the Cross Motion granted.[6]

### C.    Other Arguments

PWCS's final argument seeks a determination that PWCS is able to provide a FAPE in the least restrictive environment going forward. Dkt. 38 at 29. But this issue is not properly before this Court. As noted *supra*, this was not relief sought in the Complaint. Dkt. 1. Moreover, this issue has not been decided by the Hearing Officer. For the Court to decide an issue – not previously before the Hearing Officer and not part of the administrative review – would go beyond this Court's purview in 20 U.S.C. § 1415(i)(2)(A) (providing that a party aggrieved by a hearing officer's decision may file a civil action in district court) and violate the Fourth Circuit's caution against reducing "the proceedings before the state agency to a mere dress rehearsal." *Springer*, 134 F.3d at 667.

\*    \*    \*

In sum, PWCS has disavowed and abandoned the claims raised in its Complaint. *See Cole v. Marlboro Cnty. Sheriff's Office*, 2020 WL 8611026, at \*5 (D.S.C. Oct. 22, 2020) (discussing cases finding that judgment is appropriate on claims abandoned at summary judgment); *see also*

---

[6] PWCS's arguments attempting to draw a distinction between a "parental placement" and a hearing officer placement are likewise unavailing. Here, the Parents made the decision to enroll Student at The Wakefield School. A.R. 67. Indeed, PWCS specifically asserts that the "Parents unilaterally enrolled Student at The Wakefield School." Dkt. 38 at 6. PWCS also recognizes that "a parental placement may be found to be appropriate by a special education hearing officer or a court even if it does not meet the standards of [VDOE] that apply to education provided by the VDOE and provided by the local school division." Dkt. 38 at 28 (citing 8VAC20-81-150(B)(3)). Despite its acknowledgement that Student was enrolled in The Wakefield School by the Parents and that a special education hearing officer may approve of a parental placement at a private school not specifically approved by the VDOE to provide special education services, PWCS argues that Student's placement at The Wakefield School was not a parental placement. *Id.* This argument is not supported by the facts or the law.

Dkt. 38 at 2 n.1 (abandoning challenge based on Student's 9th grade year). Moreover, the arguments raised in its Judgment Motion regarding prospective placement of Student at the Wakefield School are not properly founded on the Hearing Officer's Decision. Accordingly, PWCS's Judgment Motion is denied. On the other hand, Parents' Cross-Motion seeking dismissal of the Complaint is granted, given that PWCS has abandoned its claims in the Complaint and vacatur of the Hearing Officer's Decision is not appropriate.

## VI.    Motions to Enforce

Finally, the Parents have filed two motions to enforce the TRO. Dkts. 61, 67. In the Parents' view, PWCS has violated the TRO by failing to pay $3,069.75 for Academic Resource Center fees and "required fees for tuition insurance." Dkt. 61. In the Second Motion, the Parents assert that PWCS has violated the TRO by failing to pay $8,825.71 owed for the 2025-26 school year and $597.55 owed for the prior school year. Dkt. 68.

As a reminder, the Hearing Officer's Decision was clear that the Parents would be "reimbursed for costs of enrollment/tuition associated with the student's attendance at The Wakefield School" but that there would be "no reimbursement to the parents for any activity costs or fees that are owed in addition to tuition." A.R. 93. In determining that The Wakefield School was an appropriate stay-put placement, this Court employed the Hearing Officer's determination and held that Parents were entitled to "reimbursement of I.L.'s *tuition* payments." Dkt. 58 at 3 (emphasis original). Indeed, both the Court's Order and the Hearing Officer's Decision were very clear that PWCS was only responsible for tuition payments.

With respect to the tuition insurance fees paid by Parents, it appears that these fees are associated with how Parents have chosen to initially pay Student's Tuition. Dkt. 65-2 at 30. According to the paperwork provided by the Parents, the Parents may pay tuition "under one of

24

three Tuition Payment Plans," but "the Tuition Refund Plan, must be purchased by Parents electing Tuition Payment Plans 2 or 3." *Id.* The paperwork provided further demonstrates that there is a $700 fee associated with the Parents' chosen payment plan and that the Parents opted into the Tuition Refund Insurance plan, which is required given their chosen payment plan, for a fee of $666. *Id.* at 31. Because these fees are incurred as a result of choices that the Parents made and are not a required enrollment or tuition fee, they do not fall within the reimbursement ordered by the Court or required by the Hearing Officer. Both decisions were clear that the Parents were entitled to reimbursements for tuition, but not any other fees that may be charged by a private facility like The Wakefield School. Thus, the Motions will be denied in this regard.

Similarly, to the extent that the Parents seek reimbursement for the ARC fees, such fees are not a part of tuition and thus are not covered by the Hearing Officer's Decision or this Court's prior Order. Indeed, as Ms. Harper testified the "ARC" is an additional resource where students can get support for an additional fee. A.R. 3466 at 740:15-19; A.R. 3473 at 767:17-768:8. Such additional programming and fees therefore fall within the category that the Hearing Officer specifically excluded from reimbursement: "There will be no reimbursement to the parents for any activity costs or fees that are owed in addition to tuition." A.R. 93. Accordingly, the Motions will also be denied with respect to the ARC fee.

In the First Motion, the total sought was $3,069.75. Dkt. 61. As set forth in the documents provided by the parties, that number is calculated based on: (i) a $619.75 tuition insurance fee; (ii) a $700.00 tuition finance fee; and (iii) a "ARC Fee x 2" of $1750. Dkt. 71-1 at 52. Because none of those fees are required to be paid pursuant to the Court's Order or the Hearing Officer's Decision, the Court will deny the First Motion.

25

In the Second Motion, the total sought was $9,423.30, representing $8,825.75 for the 2025-26 school year and $597.55 for the 2024-25 school year. Neither the Motion nor the exhibits provide any reference for the alleged outstanding balance of $597.55 for the 2024-25 school year. Dkts. 67, 68, 68-1, 68-2. Accordingly, to the extent the Second Motion seeks a payment of $597.55, the Second Motion is denied. With respect to the $8,825.75, it is likewise unclear to the Court from where that figure is derived. The attachments to the Second Motion show payments that the Parents made of $7,506 and that the Parents transmitted the invoice and the payment receipt to PWCS as required by the Order. Dkt. 68-1 at 2-5. However, that $7,506 figure includes payment plan fees and the tuition insurance fee, which PWCS is not required to pay. After subtracting those fees, the amount that the Parents paid is $6,700. It is unclear to the Court whether the remaining $6,700 includes the ARC fee. Accordingly, the Parents are directed to submit to the Court an affidavit, under penalty of perjury, stating whether the fees included on the August 20, 2025 invoice from The Wakefield School include the ARC fee and, if so, the amount of the ARC fee. After the Court receives that affidavit, PWCS will be directed to pay either the $6,700, or the $6,700 less the ARC fee. Given that the Parents sought reimbursement for fees not required by the Hearing Officer's Decision or this Court's prior Order, the Court declines to hold PWCS in contempt.[7]

---

[7] As the Court was making the determinations discussed in this Memorandum Opinion and Order, the Parents filed a second Motion for a Temporary Restraining Order seeking relief on an emergency basis. Dkt. 72. To begin with, the Court does not view this Motion as an emergency given that the Parents' counsel first contacted chambers for this District Judge on Thursday, October 23, 2025, indicating that she would be filing an emergency motion seeking enforcement of the TRO. Notwithstanding counsel's representations to chambers, no motion was forthcoming. Instead, counsel waited two weeks to file this motion. It appears that counsel intended to force the Court's hand (an approach which patently fails) with respect to resolution of the Enforcement Motions – which themselves should more properly have been categorized as motions for orders to show cause, given that the Parents alleged a violation of the original TRO. With respect to the substance of the Motion, the Court has largely addressed the merits in the disposition of

## VII.    CONCLUSION

In short, PWCS abandoned its claims related to the Hearing Officer's determinations with respect to the 2023-24 school year, which were raised in the Complaint.  And PWCS's arguments regarding a prospective placement of Student at The Wakefield School rest on a broad misreading of the Hearing Officer's Decision.  The Court does not find that the Hearing Officer required that Student be placed at The Wakefield School for the remainder of her high school education; rather, the Court finds that the Hearing Officer's Decision reflected a determination that Student should continue her education at The Wakefield School for the school year under consideration during the hearing pursuant to the Parents' placement of Student at that school.

Accordingly, it is hereby ORDERED that PWCS's Motion to Submit Additional Evidence (Dkt. 30) is GRANTED IN PART and DENIED IN PART; and it is

FURTHER ORDERED that PWCS's Motion to Exclude Expert Testimony (Dkt. 34) is DENIED, because Dr. Savage's expert testimony was never part of the Administrative Record; and it is

FURTHER ORDERED that PWCS's Motion for Judgment on the Administrative Record (Dkt. 37) is DENIED; and it is

---

Enforcement Motions.  To the extent that the Parents seek reimbursement of additional amounts beyond what the Court has resolved through the Enforcement Motions, the second TRO Motion is not well taken.  As discussed *supra*, PWCS is not responsible for fees, associated with loans or otherwise, with respect to the Parents' responsibility to pay for The Wakefield School tuition up front.  That is a consequence of the IDEA's and the Hearing Officer's requirements that payments be made through reimbursement.  With respect to any outstanding balance for the current school year, the invoice showing payment is dated November 4, 2025, and the Parents have not submitted documentation demonstrating that they provided such proof of payment to PWCS and that PWCS has refused to pay it, as required in the original TRO Order.  With respect to the current school year, until any new IEP takes effect, PWCS should reimburse the Parents for tuition consistent with this Court's ruling reflected in this Memorandum Opinion and Order.

FURTHER ORDERED that the Parents' Cross-Motion for Judgment on the Administrative Record (Dkt. 44) is GRANTED; and it is

FURTHER ORDERED that the Parents' Motion to Enforce Judgment (Dkt. 61) is DENIED; and it is

FURTHER ORDERED that the Parents' Motion to Enforce Judgment (Dkt. 67) is GRANTED IN PART and DENIED IN PART; and it is

FURTHER ORDERED that the Parents are DIRECTED to submit an affidavit, under penalty of perjury, stating whether any portion of the $6,700 in tuition reflected on the invoice (Dkt. 68-1 at 4) covers the ARC fee; and it is

FURTHER ORDERED that, within seven (7) days of receipt of an affidavit by the Parents stating, under penalty of perjury, that no portion of the $6,700 covers the ARC fee, PWCS is DIRECTED to reimburse the Parents the $6,700. If the $6,700 includes the ARC fee, then PWCS is DIRECTED to reimburse Parents the $6,700 less the amount of the ARC fee; and it is

FURTHER ORDERED that the Motion for a Temporary Restraining Order (Dkt. 72) is DENIED as cumulative and duplicative, given that this Court has already issued a TRO and given the Court's resolution of the Enforcement Motions; and it is

FURTHER ORDERED that the Clerk of the Court is DIRECTED to enter Rule 58 judgment in favor of Defendants and against Plaintiff and to place this matter among the ended causes.

IT IS SO ORDERED.

Alexandria, Virginia
November _13_, 2025

/s/
Rossie D. Alston, Jr.
United States District Judge

28